UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 42 USC 1983 COMPLAINT

The Thing People Dont UNDERSTAND
is I am The Book of Laws
my father is The Laws I am The
Book    Hashem is king his son is prince
This is Not aBout money it DoN get personal
The world is going TO
Change and Im going
To Be The one TO Change
it Because How I am Im Lucifer
Im a god on eath The son
of Hashem The Star That Shines
so Bright. I Stand for The constitution

SDNY PRO SE OFFICE RECEIVED 2024 AUG -2 AM 9:42

Pro-se Office can yo
//please Send each
Judge a Copy

The devil is Lucifer
if you Take out The
"i"  Lucifer it Becomes
a Hebrew Name
Lucfer with
out the "i"

Lucifer is Latin Name
Lucfer is Hebrew Name

Hon. Lewis J. Liman
21 CV 6718 (LJL)

Hon. Gary Stein
22 CV 973

Tepal of Leviticus priest "

it aBout Doing what is right

it NOt aBout me its aBout "US" as
a Nation on eath The Best Nation

HASHEM IS King his son is prince

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

Robert Lee Murray known as -
LEViticus BoFMET Lucfer

Write the full name of each plaintiff.

No. _____

(To be filled out by Clerk's Office)

-against-

City of NEW York etal
Health and Hospitals Doc
C.O Bond #2413, Doctor John Doe

Write the full name of each defendant. If you cannot fit the names of all of the defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed above must be identical to those contained in Section IV.

**COMPLAINT**
(Prisoner)

Do you want a jury trial?
☐ Yes  ☑ No

666 LEViticus
The Book of Laws

Son of The morning
The morning Star

BoFMET Power

Lucfer Prince

### NOTICE

TO The people

The public can access electronic court files. For privacy and security reasons, papers filed with the court should therefore *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule of Civil Procedure 5.2.

Rev. 5/6/16

## I.    LEGAL BASIS FOR CLAIM

State below the federal legal basis for your claim, if known. This form is designed primarily for prisoners challenging the constitutionality of their conditions of confinement; those claims are often brought under 42 U.S.C. § 1983 (against state, county, or municipal defendants) or in a "*Bivens*" action (against federal defendants).

☑ Violation of my federal constitutional rights

☑ Other:    injuntion relief

## II.    PLAINTIFF INFORMATION

Each plaintiff must provide the following information. Attach additional pages if necessary.

Robert          Loe          Murrary
First Name          Middle Initial          Last Name

LEViticus BOfMET Luccer
State any other names (or different forms of your name) you have ever used, including any name you have used in previously filing a lawsuit.

99023 00088
Prisoner ID # (if you have previously been in another agency's custody, please specify each agency and the ID number (such as your DIN or NYSID) under which you were held)

OBcc
Current Place of Detention

1600 Hazen St
Institutional Address

E.Elmhurst          N.Y.          11370
County, City          State          Zip Code

## III.    PRISONER STATUS

Indicate below whether you are a prisoner or other confined person:

☑ Pretrial detainee
☐ Civilly committed detainee
☐ Immigration detainee
☐ Convicted and sentenced prisoner
☐ Other:

## IV.    DEFENDANT INFORMATION

To the best of your ability, provide the following information for each defendant. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are identical to those listed in the caption. Attach additional pages as necessary.

Defendant 1:    City          of     NEW York

First Name                Last Name                Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City                State                Zip Code

Defendant 2:    Health and Hospital Doc

First Name                Last Name                Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City                State                Zip Code

Bond                2413

Defendant 3:

First Name                Last Name                Shield #

C.O

Current Job Title (or other identifying information)

1600

Current Work Address

HazENSt EastElmhurst NY 11370

County, City                State                Zip Code

Defendant 4:    Doctor John Doe

First Name                Last Name                Shield #

Doctor Haelth and Hospital

Current Job Title (or other identifying information)

1600 HazEN St

Current Work Address

East Elmhurst NY 11370

County, City                State                Zip Code

## V.    STATEMENT OF CLAIM

Place(s) of occurrence: (NIC) OBCC 6-24-24 7L

Date(s) of occurrence: JUNE NOT Shor NIC 6-24-24 OBCc

## FACTS:

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and how each defendant was personally involved in the alleged wrongful actions. Attach additional pages as necessary.

around or aBout 6-16-24 I was infram By a ~~cape~~ capt in (NIC) medical unit that The Doctor was DissChergen me and Taken my wheel chair away she cant DO That DO TO my diagnoses and my medical condition I was Thretin with Force would Be used if I DiD NOT go

I was Sent TO GRVC mental health unit I infarmd The mental health staff I Dant Take medication for mental illness why am I here at This Time I could Feel The pain in my Legs I Take a very high Dose OF gabapentin it help my condition The Dose of medication I Take of gabapentin/NEURONTIN is The highis DOSe you can receive I Take 1800 mg a Day

2

I was sent from GRVC mental health unit To GP OBCC when I got To OBCC I informd medical staff That I have a condition with my Legs I cant Do stairs OR walk long Disstins

I call my comin Law wife cynthia and Told here aBout what was going on with me and DOC staff Takeing my wheel chair She Told me TO Take it one Day at a time

on 6-24-24 I was sitting On my Bed in OBcc Doorm 2 inmate started harassing me Telling me They was going To attack me my Bed was in The Front of The house NERE The officer Desk The way They was Talk The officer had To Bear what Thay was Saying To me

When The inmate came To my
Bed Try'd To flip my mattrist
With my work on it I Stude
uP The inmate Spit in my Face
That when me and him got
in to a fight

in her CO. Bond report say She observed
me in a verbal altercetion with inmate
Ricardo why it got as far as a fight when
he was Fliping my Bed and ~~and~~ Telling
me he ~~was~~ going To use violence on
me

after I was Taken out The unit
my Bed with all my inportin Legal
work was NOT There it was
Stolen

Im reading The OFFicers report
what She Say happen it DiD Not
happen That Way if a OFFicer write
a report To protect ████ inmates Thats
Because She Sent Them in order To
Take my Legal work and make it
look like a altercation Between inmates
I would like The cart To ordr The video
and match it uP TO The report

# CORRECTION DEPARTMENT
## CITY OF NEW YORK

**ATTACHMENT A**

Form: 6500A
Rev.: 07/09/21
Ref.: Dir #6500R-G

## REPORT AND NOTICE OF INFRACTION

| Infraction #: | Institution: OBCC | Date of Incident: 06/24/24 | Time Infraction Written: 2130 hrs | Date of Report: 06/24/24 |
|---|---|---|---|---|

Individual's Name (Last, First): **Murray, Robert**
B&C/Sentence #: **9902300038**   NYSID #: **06093686K**

Location of Incident (Be Specific): **Dorm 7 Lower common area**
Housing Area Location: **Dorm 7 Lower**  Approximate Time of Incident: **2005**  Hrs.

| Charge # | Offense | Charge # | Offense |
|---|---|---|---|
| 101.14 | Assault/fight | | |
| 108.10 | Disorderly conduct | | |
| 107.10 | Destruction of property | | |

Reporting Official (Print Name, Rank and Shield #): **Bond, CO #2413**

Reporting Official (Signature): **Bond**

**Details of Incident** (include details as to How, When and Where Infraction was Committed):

On Monday June 24, 2024 at approximately 2005 hours. I, CO Bond #2413 assigned to Dorm 7 lower " B" post on the 1400 X 2331 hours tour observed inmate Murray, Robert B/C #9902300038M, NYSID # 06093686K engageg in a verbal altercation with inmate Henry, Ricardo B/C #9952200064, NYSID #14852173L. Inmate Henry then proceeded to bed #35 assigned to inmate Murray and removed the mattress at which time inmate Murray struck inmate Henry with a closed fist to the facial area knocking inmate Henry to the bed. This writer gave both inmates verbal direct orders to stop fighting, both inmates complied. Inmate Murray then grabed inmate Henry's institutional tablet off Henry assigned bed #36 and slammed it on the floor thereby destroying the tablet. Inmate Murray was escorted out of the housing area terminating this incident. Area supervisor was notified.

You are entitled to a hearing for this infraction no sooner than twenty-four (24) hours after you are served with this notice. If you are a sentenced individual and you commit an infraction within twenty-four (24) hours prior to your discharge, and have not reached your maximum sentence expiration date, you may be served with charges and held for a hearing. The Department will make every effort to hold the hearing within three (3) business days of the service of this notice. This three (3) business day period excludes the day you are served, weekends, holidays, days you go to court (whether in person or via teleconference), days you are hospitalized or at a hospital attending a clinic, days you leave the facility for an attorney interview, days you are unavailable because you are transferred to another facility and days you are unavailable due to your absence from the facility for any purpose. The three (3) business day period is automatically extended by one (1) business day if you are transferred to another facility prior to your hearing (unless you are a Pre-Hearing Detention individual). Commencement of a hearing after three (3) business days is at the discretion of the Adjudication Captain and is not barred by Department rules.

At your hearing you have the following rights:

1. Right to appear personally, unless you waive your right to appear, refuse to attend the hearing or appear at the hearing and become disruptive.
2. Right to make statements. If you choose to remain silent, your silence cannot be used against you. If you make a statement, such statement cannot be used in a subsequent criminal trial unless you have been given a Miranda Warning and then voluntarily testify.
3. Right to present material evidence.
4. Right to present witnesses.
5. Right to the assistance of a Hearing Facilitator.
6. Right to an Interpreter if you cannot communicate well enough in English.
7. Right to appeal.

Within twenty-four hours of the Adjudication Captain reaching a decision of guilty, you will receive a copy of the "NOTICE OF DISCIPLINARY HEARING DISPOSITION" form informing you of the violation(s) you are found guilty of, the basis for that finding, the evidence relied upon and the penalty to be imposed. The following penalties are the maximum which may be imposed individually or in any combination.

1. Reprimand.
2. Loss of privileges.
3. Loss of good time if you are a sentenced inmate.
4. Punitive segregation for up to thirty (30) days per each applicable individual charge.
5. Restitution for intentionally damaging or destroying City property.

A commissary restriction will be imposed on all inmates found guilty of a Grade I (14 day freeze) or Grade II (7 day freeze) offense. You have the right to appeal an adverse decision rendered by the Adjudication Captain.

Interpreter Requested: ☐ Yes  ☑ No  (If yes, include what language) _____
Hearing Facilitator Requested: ☐ Yes  ☑ No
Witness(es) Requested: ☐ Yes  ☐ No  (If yes, include witness(es) Name, Book and Case Number (if inmate) or Shield/ID (if staff) and Location (if inmate) or Post (if staff).

Witness (Print Name): _____ B&C Number: _____ Location: _____
Witness (Print Name): _____ B&C Number: _____ Location: _____
Witness (Print Name): _____ B&C Number: _____ Location: _____
Witness (Print Name): _____ Shield/ID Number: _____ Post: _____

I certify that I received a copy of this notice.
Signature of Individual: **Refuse**   Date: 6/27/24   Time: 0714

Served by (Print Name, Rank and Shield #): **CO Bond #2413**
Signature of Server: 

Refused to Sign for Notice: ☑ Yes  ☐ No
Witnessed By: 

**DISTRIBUTION:  (SINGLE SIDED) COPY - NOTICE TO INDIVIDUAL    (DOUBLE SIDED WITH FORM 6500B) COPY TO FACILITY**

4

I was Never Taken To medicel
I know my Legs was mess up Becouse
I could Feel The pain in my Legs The
Inmate Kock out my Teeth and I had
Swelling To my Face when The moning
came my legs was swelling up it was
heard For me To walk I Told The
Capt. That walk the house of 4SW unit
I Need To See medicel She
Told me To call Sick call I Told
her I was in a Fight yesterDay
I was Never give medical Forl my
injurys She refuse To Send me To medical
at This Time I could Berly walk

When I was refused medicel
I called (311) Complaint # EC-00827157
and EC-00827157 6-25-24

at This Time my Legs are Bad Im
in a very Bad State of pain in my Leg
arms and Back Im in a cell Lock in
Being Refuse my medications

On The FLoor and midical is aware

On 7-3-24 They came and Told me I have court I Told Them I Need medical I was push To medical in a chear I Told The Doctor I Need out side medical The Co was Try To get The Doctor To write a Order To use force on me Im Telling The Doctor I have injurys

The Doctor Look up my medical File with my condition hes Not supose To Be in OBCC The Doctor wrot I Needed A wheelchair To go To court I was refused court and a Nother Doctor Told The officer and Capt To Take me Back To my cell I was Push Back To The unit Back To my cell and have Not receive Tretment To This Day This was 7-3-24

This part of my claim is a failure to Protect claim

in my case the jail officials are responsible for ongoing attacks I Suffering at The hands of staff and incarcerated people Thay have even went as fare as Try To Take my Life and make it Look like I Killed my Self

as a humen my Pretrial condition of Confinement, The condition I am Being Subjected TO, are Sufficiently "bad" prison officials responsible for my condition Thay went to act the way thay did and Doc, mental health and health and Hospitals Doc. objectively unreasonable, I Thank The people of are Nation Need To Know aBout me violence against me By work people To cove up a Rape on me holding me in jail with No Bail for 2½ years Becquse I was set up By officer TO stope me From getting The money I Need for my work on SLAVERY I will, Befor I stope Doing my work on reperations Hashem will Take me out The Book of life

Provide a statement that identifies the relevant facts and makes a showing of likely merit as to each issue you intend to present on appeal. See Local Rule 24.1

Reparations for Slavery is the application of the concept of reparations to victims of slavery and/or their descendants there are concepts for reparations in Legal philosophy and reparations in transitional justice Reparations can take numerous forms including: affirmative action, individual monetary payments Settlements, Scholarships waiving of fees and Systemic initiatives to offset injustices, land-based compensation related to independence, apologies and acknowledgements of the injustices that my people went through here in America, There are instances of reparations for Slavery, relating to the Atlantic slave TRADE dating back to at least 1783 in North America with a growing list of modern day Examples of

2

Provide a statement that identifies the relevant facts and makes a showing of likely merit as to each issue you intend to present on appeal. See Local Rule 24.1

reperations for Slavery in the United States in 2020 as the call for reparations in the US has been bolstered by protests around police brutcity and other cases of Systemic racism in the US. Recently in the US the call for reparations for racism has been made alongside calls for reparations for Slavery Despite many calls for reparations examples of international reparations for Slavery consist of recognition of the injustice of Slavery and apologies for involvement Harvard "with material compensation in 1999 the Africa World Reparations and Repetriation Truth Commission called for the west to

3

Provide a statement that identifies the relevant facts and makes a showing of likely merit as to each issue you intend to present on appeal. See Local Rule 24.1

Pay $777 trillion to Africa within five years, in September 2001, The United Nations sponsored The world conference against Racism Racial Discrimination, xenophobia and Related intolerance held in Durban south Africa The Durban Review Conference sponsored a resolution stating that The west owed reparations to Africa due to the racism, racial discrimination xenophobia, and related intolerance" That the Atlantic slave Trade caused (32)(33)(34) — Leaders of several African nations supported This resolution The former minister of justice of Sudan, Ali mohamed Osman Yassin Stated That The slave trade is responsible



Civil war and the ratification of the
Thirteenth Amendment to The United States
constitution which declared That "Nether
Slavery nor involuntary servitude, except as a
punishment for Crime whereof the party shall
have been duly convicted shall exist within
The united States or any place subject to their
jurisdiction At that Time, an estimated fourmillion
African were set free. and Lincoln gave The
Niggers The The freedom and forty acres
and a mule Lincoln just DIDet give The Nigger
Land But he gave Them The resoures of
That Land with was The Land They work
as slaves and The corparations They Built
The Radical Republican made Lincoln murders
and Take Back not just Land But
Corparations, ToDay That money and Gold That
was Take Built othere corparations ToDay

[illegible] Eviticus Befmet Lucfer

Sign [signature]

New York City Comptroller
Brad Lander

Office of the New York City Comptroller
1 Centre Street
New York, NY 10007

Form Version:    NYC-COMPT-BLA-PI1-E

# Personal Injury Claim Form

Electronically filed claims must be filed within 90 days of the occurrence using the Office of the NYC Comptroller's website. If the claim is not resolved within one (1) year and 90 days of the occurrence, you must start a separate legal action in a court of law before the expiration of this time period to preserve your rights.

**I am filing:**    ○ On behalf of myself.

○ On behalf of someone else. If on someone else's behalf, please provide the following information.

Last Name:

First Name:

Relationship to the claimant:

**Claimant Information**

*Last Name:        MURRAY

*First Name:       ROBERT

*Address:          09-09 HAZEN ST

Address 2:

*City:             BRONX

*State:            NEW YORK

*Zip Code:

*Country:          USA

Date of Birth:                    Format: MM/DD/YYYY

Soc. Sec. #

HICN:
(Medicare #)

Date of Death:                    Format: MM/DD/YYYY

Phone:

*Email Address:    SARA@RICKNERPLLC.COM

*Retype Email Address:    SARA@RICKNERPLLC.COM

Occupation:

City Employee?    ○ Yes    ○ No    ○ NA

Gender            ○ Male    ○ Female    ○ Other

◉ Attorney is filing.

**Attorney Information (If claimant is represented by attorney)**

+Firm or Last Name:    RICKNER PLLC

+Firm or First Name:    SARA WOLKENSDORFER

+Address:              14 WALL STREET, SUITE 1603

Address 2:

+City:                 NEW YORK

+State:                NEW YORK

+Zip Code:             10005

Tax ID:

Phone #:

+Email Address:        SARA@RICKNERPLLC.COM

+Retype Email Address:    SARA@RICKNERPLLC.COM

**The time and place where the claim arose**

*Date of Incident:    09/04/2023    Format: MM/DD/YYYY

Time of Incident:                  Format: HH:MM AM/PM

*Location of Incident:    GEORGE R. VIERNO CENTER (GRVC), RIKERS ISLAND

Address:

Address 2:

City:

*State:    NEW YORK

Borough:

**\* Denotes** required fields.
**+Denotes** field that is required if attorney is filing.
**A Claimant** OR an Attorney Email Address is required.



New York City Comptroller
Brad Lander

Office of the New York City Comptroller
1 Centre Street
New York, NY 10007

**\*Manner in which claim arose:**

THIS CLAIM COMPRISES THREE SEPARATE EVENTS: THE FIRST CLAIM AROSE ON SEPTEMBER 4, 2023 FROM APPROXIMATELY 12-3PM, IN CELL 8, HOUSING AREA 17B, GRVC. A GROUP OF CORRECTION OFFICERS (COS) SPRAYED HIM AND HE WAS HIT ON HIS BACK AND SIDE. THE IDENTITIES OF THE COS INVOLVED ARE CURRENTLY UNKNOWN.

THE SECOND CLAIM AROSE ON SEPTEMBER 7, 2023 FROM APPROXIMATELY 5-7PM, IN CELL 8, HOUSING AREA 17B, GRVC. A GROUP OF COS STARTED VERBALLY HARASSING CLAIMANT AND WHEN HE ATTEMPTED TO GET AWAY FROM THEM, THEY AMBUSHED AND ASSAULTED HIM. THE IDENTITIES OF THE COS INVOLVED ARE CURRENTLY UNKNOWN.

THE THIRD CLAIM AROSE ON SEPTEMBER 9, 2023 FROM APPROXIMATELY 8:30AM-11AM WHEN A CO SPIT IN HIS FOOD. LATER THAT DAY, AT SOME POINT BETWEEN 11:00AM-2:30PM, A GROUP OF COS TOOK CLAIMANT TO BCI TO FINGER PRINT HIM, COVERED UP THE CAMERAS AND STARTED BEATING HIM UNTIL HE COMPLIED. THE IDENTITIES OF THE COS INVOLVED ARE CURRENTLY UNKNOWN.

DURING CLAIMANT'S ENTIRE DETENTION ON RIKERS ISLAND, THE CONDITIONS WERE FILTHY; ACCESS TO SERVICES WAS ALMOST IMPOSSIBLE; PROMPT AND ADEQUATE MEDICAL CARE WAS UNAVAILABLE; GRIEVANCE PROCEDURES WERE UNAVAILABLE; INTAKE WAS OVERCROWDED AND DANGEROUS; NO CLEANING SUPPLIES WERE AVAILABLE; COVID PRECAUTIONS WERE ALMOST NONEXISTENT; FOOD SERVICE WAS IRREGULAR AND NUTRITIONALLY INSUFFICIENT; AND THE PHYSICAL STRUCTURE WAS DETERIORATING.

BASED UPON THE ABOVE EXPERIENCES, CLAIMANT MAKES A CLAIM FOR, INTER ALIA: ASSAULT; BATTERY; TRESPASS ON THE PERSON; INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS; NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS; NEGLIGENCE; NEGLIGENT HIRING, SCREENING, RETENTION, SUPERVISION, AND/OR TRAINING; VIOLATION(S) OF CLAIMANT'S RIGHTS PURSUANT TO THE CONSTITUTION OF THE STATE OF NEW YORK; DENIAL OR DELAY OF MEDICAL CARE AND/OR MEDICATION (INCLUDING IN VIOLATION OF NEW YORK CIVIL RIGHTS LAW SECTION 28); VIOLATION(S) OF THE NEW YORK STATE HUMAN RIGHTS LAW; VIOLATION(S) OF THE NEW YORK CITY HUMAN RIGHTS LAW; AND/OR VIOLATION(S) OF THE NEW YORK STATE CIVIL RIGHTS LAW; AND ALL INJURIES RESULTING FROM THE NEGLIGENCE, RECKLESSNESS, AND DELIBERATE INDIFFERENCE OF THE CITY OF NEW YORK, ITS AGENTS, SERVANTS AND/OR EMPLOYEES, IN THE OPERATION, MAINTENANCE, SUPERVISION AND CONTROL OF RIKERS ISLAND; THE NEGLIGENCE, RECKLESSNESS, AND DELIBERATE INDIFFERENCE OF STAFF EMPLOYED AT THE SAME; AND THE NEGLIGENCE, RECKLESSNESS AND DELIBERATIVE INDIFFERENCE OF THE CITY OF NEW YORKS, ITS AGENTS, SERVANTS AND/OR EMPLOYEES, IN THE CARE AND CUSTODY OF PERSONS HOUSED ON RIKERS ISLAND.

CLAIMANT MAKES THIS CLAIM AGAINST THE CITY OF NEW YORK BASED A RESPONDEAT SUPERIOR THEORY OF LIABILITY, AS WELL AS AGAINST THE INDIVIDUAL CITY EMPLOYEES INVOLVED IN VIOLATING CLAIMANT'S RIGHTS AND THOSE AND WHO FAILED TO INTERVENE TO PREVENT SUCH VIOLATIONS.

*Denotes required field.*



New York City Comptroller
Brad Lander

**The items of damage or injuries claimed are (include dollar amounts):**

AS DESCRIBED ABOVE, CLAIMANT SUSTAINED INJURIES TO CLAIMANT'S PHYSICAL AND EMOTIONAL WELL-BEING, AS WELL AS VIOLATIONS OF HIS CONSTITUTIONAL, COMMON LAW AND STATUTORY RIGHTS.

CLAIMANT ALLEGES THE FOLLOWING DAMAGES, AMONG OTHERS: COMPENSATORY DAMAGES FOR PAST AND/OR FUTURE EMOTIONAL AND PHYSICAL PAIN AND SUFFERING; COMPENSATORY DAMAGES FOR VIOLATION(S) OF CLAIMANT'S CONSTITUTIONAL RIGHTS; COMPENSATORY DAMAGES FOR LOSS OF PAST AND/OR FUTURE INCOME; COMPENSATORY DAMAGES FOR PAST AND/OR FUTURE MEDICAL EXPENSES; COMPENSATORY DAMAGES FOR OTHER ECONOMIC DAMAGES; DIVERSE GENERAL AND SPECIAL DAMAGES; AND PUNITIVE DAMAGES, ALL IN AMOUNTS TO BE DETERMINED BY A JURY.

CLAIMANT ALSO DEMANDS THAT THE CITY OF NEW YORK, THE DOC AND THEIR EMPLOYEES, AGENTS, AND REPRESENTATIVES TAKE IMMEDIATE STEPS TO PRESERVE ALL DOCUMENTS, ELECTRONICALLY STORED INFORMATION (INCLUDING BUT NOT LIMITED TO ALL VIDEO FOOTAGE AND AUDIO RECORDINGS RELEVANT TO THE CLAIM, AND ALL METADATA ASSOCIATED THEREWITH), AND TANGIBLE THINGS RELEVANT TO THE CLAIMS OR DEFENSES RELATING TO THIS MATTER. CLAIMANT'S DEMAND THAT THE CITY OF NEW YORK, THE DOC AND THEIR EMPLOYEES, AGENTS, AND REPRESENTATIVES PRESERVE EVIDENCE OR MATERIALS EXTENDS TO ALL DOCUMENTS, ELECTRONICALLY STORED INFORMATION OR OTHER TANGIBLE THINGS IN ANY FORM WHATSOEVER, INCLUDING, WITHOUT LIMITATION, WRITINGS, AUTHORIZATIONS, INSPECTIONS, NOTES, DRAFTS, PLANS, DRAWINGS, CHARTS, PHOTOGRAPHS, SOUND RECORDINGS, VIDEO RECORDINGS, IMAGES, EMAILS, INSTANT MESSAGES, VOICEMAILS, TEXT MESSAGES, COMPUTER FILES, FLASH DRIVES, HARD DRIVES, AND OTHER DATA OR DATA COMPILATIONS STORED IN ANY MEDIUM FROM WHICH INFORMATION CAN BE OBTAINED THAT ARE IN THE CITY OF NEW YORK'S OR THE DOC'S POSSESSION, CUSTODY, OR CONTROL, OR IN THE POSSESSION, CUSTODY, OR CONTROL OF OTHERS UNDER THE CITY OF NEW YORK'S OR THE DOC'S CONTROL OR AUTHORITY, INCLUDING THEIR AGENTS, MEMBERS, AND SERVANTS. THE DEMAND ALSO INCLUDES ANY RECORDS OF, AND RECORDS CONCERNING, E-MAIL, PHONE CALLS, SOCIAL MEDIA POSTINGS, AND TEXT MESSAGES.

IN THE "TOTAL AMOUNT CLAIMED" FIELD BELOW, IT SAYS $0.00. CLAIMANT'S DAMAGES ARE NOT ZERO, BUT THE FIELD WOULD NOT PERMIT AN ENTRY STATING THAT CLAIMANT'S DAMAGES WILL BE DETERMINED BY A JURY. CLAIMANT'S DAMAGES WILL BE DETERMINED BY A JURY. CLAIMANT PRESENTS THIS CLAIM FOR ADJUSTMENT AND PAYMENT. YOU ARE HEREBY NOTIFIED THAT UNLESS IT IS ADJUSTED AND PAID WITHIN THE TIME PROVIDED BY LAW FROM THE DATE OF THE PRESENTATION TO YOU, CLAIMANT INTENDS TO COMMENCE AN ACTION ON THE CLAIM.



New York City Comptroller
Brad Lander

Office of the New York City Comptroller
1 Centre Street
New York, NY 10007

**Medical Information**

1st Treatment Date: _____  *Format: MM/DD/YYYY*

Hospital/Name: _____

Address: _____

Address 2: _____

City: _____

State: _____

Zip Code: _____

Date Treated in
Emergency Room: _____  *Format: MM/DD/YYYY*

Was claimant taken to hospital by
an ambulance?  ◯ Yes   ◯ No   ◯ NA

**Employment Information (If claiming lost wages)**

Employer's Name: _____

Address: _____

Address 2: _____

City: _____

State: _____

Zip Code: _____

Work Days Lost: _____

Amount Earned
Weekly: _____

**Treating Physician Information**

Last Name: _____

First Name: _____

Address: _____

Address 2: _____

City: _____

State: _____

Zip Code: _____

**Witness 1 Information**

Last Name: _____

First Name: _____

Address: _____

Address 2: _____

City: _____

State: _____

Zip Code: _____   Phone: _____

**Witness 2 Information**

Last Name: _____

First Name: _____

Address: _____

Address 2: _____

City: _____

State: _____

Zip Code: _____   Phone: _____

**Witness 3 Information**

Last Name: _____

First Name: _____

Address: _____

Address 2: _____

City: _____

State: _____

Zip Code: _____   Phone: _____

**Witness 4 Information**

Last Name: _____

First Name: _____

Address: _____

Address 2: _____

City: _____

State: _____

Zip Code: _____   Phone: _____

1

# Statement of FActs

The Eighth Amendment of The constitution
protects incarcerated people from cruel and unusual
punishment In 1976 The Supreme court said
in Estelle v Gamble that a prison staffs
"deliberate indifference" to The "serious medical need
of incarcerated pepple is "cruel and unusual punishment"

I Robert Murray Hebrew name Leviticus Bafmet Lucfer
is going To prove To The District court That There
is a patrune of Doc medical staff violating prefrial
detainees rights here on Rikers Island officer
are sexual assaultting detainees and also
Violently physicaly attacking detainees and usesing
medical staff To cover up The attacks see 1-1

Let's Do The (objective part) of The Eighth
Amendment claim based on prison officials
deliberate indifference TO my medical Needs
are sufficiently serious Because Im in
a ongoing pain I have a chronic neuropathy
condition requre me To use a wheelchair as
needed I am diagnosed by a physician from
Bellevue Hospital Neurology, mandating
treatment. and midication To Treat ~~~~
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

From:    Natalie Pacht
Sent:    Monday, September 11, 2023 12:55 PM
To:      'Paul.Shechtman@doc.nyc.gov'; 'Tara.Daggett@doc.nyc.gov';
'constituentservices@doc.nyc.gov'; 'complaints@boc.nyc.gov'; Anna Friedberg;
'legal.intake@doc.nyc.gov'; 'Ruben.Benitez@doc.nyc.gov';
'DL-IDComplaints@doc.nyc.gov'
Cc:      Mary Lynne Werlwas; Veronica Vela; Ginger Lopez; Terence Davidson; Robert
Quackenbush; Kayla Simpson; Nora Demere; Sophie Gebreselassie; Zoe Ferguson; Natalie

Pacht; Katherine Haas; Maria Mirasol; Stefen Short
Subject:        ID Request/Video Preservation Request, Robert Murray, B&C:
9502200004;
NYSID: 06093686K, GRVC 17B

I write on behalf on Mr. Robert Murray, B&C: 9502200004, who is requesting video
preservation of DOC
misconduct that occurred on September 4th between 11:30 am and 1 pm, as well as the
footage of the
below described incident on September 9th, 2023 between 5 am and 7 pm.

Mr. Murray tells our office that on September 4th, 2023, he was assaulted by
officers in cell 8 of GRVC
17B. He states that during the assault, he was sprayed with chemical agents, thrown
to the ground,
handcuffed, and then further sprayed with chemicals. He tells our office that this
excessive spraying was
a form of retaliation from a report he made on June 6th. Mr. Murray reports that he
was not offered
medical after the incident and that afterward, he was locked in his cell without
access to services until
September 7th. He urgently requests to speak with the appropriate DOC Investigations
staff about this
reported incident and any DOC misconduct that took place.

Mr. Murray tells our office that since the initial assault on the 4th, he has
continued to be harassed by
DOC staff. He states that on September 7th between approximately 5 am and 5:30 am,
he received food
through his slot from officers with spit in it. He tells our office that he is
confused as to why the officers
were giving him his food instead of the typical meal staff.

Mr. Murray adds that on the 7th, he was speaking with officers about his mental
health concerns and his
ideations of "hanging up." He states that an officer on his unit encouraged him to
end his life, saying,
"don't just talk about killing yourself, just kill yourself." Mr. Murray explains
that he is extremely
concerned for his safety in his housing unit and urgently requests to speak with
investigative staff in a

confidential area outside of his housing unit about his reported concerns.

Furthermore, Mr. Murray tells our office, that on the 7th, he was physically assaulted by DOC staff again.
He reports that an officer slammed him to the floor and sprayed him with chemical agents. He states
that the chemical agents were sprayed directly into his ear and that he cannot hear out of his ear as a
result. He adds that he is suffering from rib and neck injuries as a result of this altercation. He urgently
requests to speak with the appropriate DOC staff about this reported incident and discuss any potential
DOC misconduct involved.

Would you please have DOC Investigation Division Staff and DOC security staff meet with Mr.
Murray immediately in a confidential and private manner outside of his housing unit to investigate
these reported concerns?

Please also preserve any relevant video footage and body camera footage of the above described
incidents in GRVC 17B Cell 11 on September 4th between 11:30 am and 1 pm, as well as on September
9th, 2023 between 5 am and 7 pm.

Please inform Mr. Murray and this office of the Department's investigative findings and any actions
taken to resolve this complaint, including all appropriate disciplinary action against any DOC staff
involved in the described incidents.

Thank you in advance for your attention to this matter.

Natalie Pacht (she/her)
Paralegal Casehandler
Prisoners' Rights Project

The Legal Aid Society
199 Water St, 6th Floor
New York, NY 10038
E: npacht@legal-aid.org

I Ask The courts Do To all my
Legal work has Ben Stolen can
The court Order The LAW DEPARMENT
To give NEW Discovery on case 22 CV 973 (JPO) (GS)
and 22 CV 638 (JPO)(GS) all my Soff was
Stolen and t have No way of responding
To a Motion For Summary judgement
Because of The Action of Defendent's

**INJURIES:**

If you were injured as a result of these actions, describe your injuries and what medical treatment,
if any, you required and received.

Chronic neuropathy cant hold whight on Legs
for long amounts of Time and cant walk long
Distnces and I Need my wheelchair as Needid
Doc Staff Tuke my chair and my Teeth
was kockd out Shoder is in pain
Legs are in pain and Back, swolling to Face

**VI.    RELIEF**

State briefly what money damages or other relief you want the court to order.

compensatory damages 1,000,000 each Defendant
punitive damages 2,000,000 each Defendant
injuntion To receive my medication wheelchair Back
and as The courts see just and proper

and Be Seen By an outside
Doctor

Murray v. Donald Trump Inc.





eneral Docket
Court Appeals, 2nd Circuit

| | |
|---|---|
| **Court of Appeals Docket #: 22-2939** | Docketed: 11/10/2022 |
| **Nature of Suit:** 3550 PRISONER PET-Civil Rights | |
| **Murray v. Donald Trump Inc.** | |
| **Appeal From:** SDNY (NEW YORK CITY) | |
| **Fee Status:** IFP Pending in USCA | |

**Case Type Information:**
  1) Prisoner
  2) State
  3) Civil Rights

**Originating Court Information:**
  **District:** 0208-1 : 22-cv-7924
  **Trial Judge:** Laura Taylor Swain, U.S. District Judge
  **Date Filed:** 09/16/2022

| **Date Order/Judgment:** 09/16/2022 | **Date NOA Filed:** 11/04/2022 | **Date Rec'd COA:** 11/10/2022 |
|---|---|---|

**Prior Cases:**
  None

**Current Cases:**
  None

**Panel Assignment:**   Not available

The Appeal of Robert Lee murray
Know as Leviticus Bafmet Lucfer
Son of Hashem
Earth, the beautiful, rose "Trish"
UP Bread-bosomd she is
The steadfast base of all
Things. And Fair Earth first
bore The Starry Heaven
equal To her-self To cover
her on all sides and to be
A home forever for the Blessed
Gods

Plaintiff
Signature
Date 2-20-23

22-2939 Murray v. Donald Trump Inc.



Robert Lee Murray, as Leviticus Lucifer et al. Tribe of
Shabazz desendent of Hebrew slaves (State Prisoner:
950-22-00004)
                    Plaintiff – Appellant

Robert Lee Murray, –
[NTC Pro Se]
Anna M. Kross Center
18-18 Hazen Street
East Elmhurst, NY 11370

Robert Lee Murray, –
Terminated: 12/16/2022
[NTC Pro Se]
North Informary Command (NIC)
15-00 Hazen Street
East Elmhurst, NY 11370

Donald Trump Inc.
                    Defendant – Appellee

John Doe Corporations, Built of the back of slavery
                    Defendant – Appellee

John Doe
                    Defendant – Appellee

Donald Trump
                    Defendant – Appellee



**MEMO ENDORSED**

THE CITY OF NEW YORK
**LAW DEPARTMENT**
100 CHURCH STREET
NEW YORK, N.Y. 10007

**MURIEL GOODE-TRUFANT**
*Acting Corporation Counsel*

**EUN JEE (ESTHER) KIM**
*Assistant Corporation Counsel*
Tel.: (212) 356-2340
Fax: (212) 356-3509
Email: eunkim@law.nyc.gov

June 27, 2024

<u>**VIA ECF**</u>
Honorable Gary Stein
United States Magistrate Judge
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:    <u>Robert Murray, as Leviticus Lucifer v. C.O. John Doe, et al.</u>,
             22 Civ. 973 (JPO) (GS); and
             <u>Robert Murray, as Leviticus Lucifer v. C.O. John Doe, et al.</u>,
             22 Civ. 638 (JPO) (GS)

Your Honor:

        I am an Assistant Corporation Counsel in the Office of Muriel Goode-Trufant, Acting Corporation Counsel of the City of New York and the attorney assigned to the defense of the above-referenced matters. In that capacity, and in accordance with the Court's June 13, 2024 Order, I write to respectfully provide a status update on the two above-referenced matters.

        By way of background, the undersigned is currently handling the defense of four of Plaintiff's cases which are pending in the Southern District of New York, and it is my understanding that Plaintiff has an additional matter against the City, which is also filed in the SDNY and being handled by another attorney at my office.[1] Since the last status update to the Court on June 3, 2024, the undersigned and Plaintiff were able to confer telephonically on June 4, 2024 regarding potential settlement of all of Plaintiff's matters. As Your Honor may recall, Plaintiff provided previously a very high settlement demand and also requested non-monetary relief; during the June 4, 2024 call, the undersigned informed Plaintiff that the City will not be able to consider his non-monetary demand but that the City is willing to discuss a potential

---

[1] The undersigned is currently handling the following matters: 22 Civ. 973 (JPO) (GS), 22 Civ. 638 (JPO) (GS), 21 Civ. 6718 (LJL), and 22 Civ. 226 (LJL); and another ACC is handling 23 Civ. 458 (MMG).

monetary resolution. During that conversation, however, Plaintiff did not revise his demand. At this time, Defendants are still in the process of evaluating all of Plaintiff's open matters for a potential global settlement. Given the number of matters Plaintiff has brought and the need to assess each one separately, Defendants respectfully request an additional forty-five days, until August 12, 2024, to assess these cases for possible resolution and advise the Court as to whether the parties would like to schedule a settlement conference with Your Honor.

In light of the foregoing, Defendants respectfully request an additional forty-five days, until August 12, 2024, to update the Court as to whether the parties would like the Court to schedule a settlement conference, or whether Defendants intend to move forward with their motions for summary judgment.

Thank you for your time and consideration to this matter.

Respectfully submitted,

/s/ *Eun Jee (Esther) Kim*

Eun Jee (Esther) Kim
*Assistant Corporation Counsel*
Special Federal Litigation Division

cc:    **VIA FIRST-CLASS MAIL**
Robert Murray
*Plaintiff pro se*
ID#: 9902300038
16-06 Hazen Street
East Elmhurst, NY 11370

Application granted. Defendants shall advise the Court, by no later than August 12, 2024, as to the status of their efforts to resolve this dispute and Plaintiff's other actions pending in this Court.

Date:    June 28, 2024
New York, New York

**SO ORDERED:**

**HON. GARY STEIN**
**UNITED STATES MAGISTRATE JUDGE**

2



Attorney General Letitia James says only a federal takeover can fix the problems in the city's jail system. GETTY

# James supports federal takeover of city's trouble jails, including Rikers

**BY GRAHAM RAYMAN**
NEW YORK DAILY NEWS

New York Attorney General Letitia [James] threw her office's considerable influence Friday behind a court-ordered takeover of Rikers Island and other city lockups.

In a letter to Manhattan Federal Judge [Laura] Taylor Swain, James argued that only receivership can fix decades of dysfunction in the city's beleaguered jail system.

"A receiver is needed to effectuate the change and order required under State and federal minimum standards," said the letter signed by Assistant Attorneys General Louis and Lois Saldana.

"We respectfully ask the court to ... order receivership, and any other additional action is necessary to resolve the crisis and ensure safety in NYC jails."

The city Law Department and the Correction Department did not have immediate comment on the filing.

Swain is presiding over Nunez v. City of New York, a class action lawsuit filed in 2011 over violence and excessive staff use of force. In 2015, the city agreed to a consent decree with the Department of Justice which created a monitor to track progress at the jails.

James' letter is one of a series of briefs expected to be filed in support of a Nov. 17 motion by the Legal Aid Society and a letter from Manhattan U.S. Attorney Damian Williams seeking federal receivership for the city lockups.

The briefs were due Friday.

Noting that six detainees have died in the past six months on Rikers Island, the AG's letter details troubling facts about jail deaths in 2021 and 2022.

"It has become clear that the dangerous conditions that have plagued DOC [city Department of Correction] jails for many years continue to this day," the letter said. "Of particular concern is DOC's persistent failure to ensure adequate supervision of people in custody."

The letter cites a series of breakdowns that contributed to deaths, including failures by correction officers to conduct their rounds, failures to properly supervise and staff jail posts, and the falsification of records to cover up posts that are unstaffed.

In one case, after Esias Johnson, 24, died of a methadone overdose on Sept. 7, 2021, investigators found officers failed to do their rounds for a six-hour period. Rigor mortis, which sets in two to eight hours after death, was in effect when Johnson was found.

Investigators with James' office found that a correction officer "falsely noted in the logbook that 'active supervision' was conducted every 30 minutes as required" by city rules, James' letter says.

The death of Tarz Youngblood on Feb. 27, 2022, followed a similar pattern. In that case, officers conducted just one tour over three hours before he was carried out of his cell by other detainees.

Mary Yehudah, who died May 18, 2022, of severe diabetic shock, was moaning in pain all night before she was found unresponsive on the floor of her cell.

"Unstaffed posts, failure to conduct rounds, and failure to render prompt first aid were persistent problems identified in our investigations," the AG's letter said.

"These failures are unacceptable and are a result of the DOC's inability to provide the most basic requirement for running a jail – direct supervision."

Also Friday, the New York Civil Liberties Union filed a brief supporting receivership that scored "the aggressive effort by City officials to block the Court, other oversight bodies, and the public from access to vital information about the operation of the City's jail system and about the plight of those trapped in that system."

The letter, by NYCLU lawyers Molly Biklen and Christopher Dunn, said a receiver would provide "this court and the public an important opportunity to increase transparency into the humanitarian crisis."

Under receivership, Swain would select an outside person – likely a lawyer, judge or correction professional – to run all or parts of the jail system with powers laid out by her.

The city is expected in January to file a motion opposing receivership that likely will be followed by additional legal wrangling before Swain makes a decision.

# EDITORIAL

# Failure all around on Santos

When House Speaker Mike Johnson announced the results of the expulsion vote yesterday morning at 11:00:20 (they keep very precise records) Con(gress)man George Santos became plain old regular con George Santos, ending what we hope is his first only term in elected office just shy of 11 months, a very short tenure, although he did last longer than Speaker Kevin McCarthy.

While the expulsion was wrong and the two Democrats and 111 other Republicans besides Santos were correct to vote no (another pair of Democrats not present), 311 bipartisan votes to expel broke the precedent and carried the day, ushering Santos out.

His rise and fall was a failure by many people and institutions.

It was a failure of the Republican Party organization in Nassau (once the most potent machine in the country) and Queens to see who this guy was before granting him their ballot line unopposed last fall. Having run in 2020 as a sacrificial lamb against Rep. Tom Suozzi, who dispatched him with ease, the GOP bosses gave Santos their line without even making a phone call to see who he was (and who he was not, like a college grad, a banker or a Jew).

It was a failure of Democrats in Nassau and Queens and their primary winner, Robert Zimmerman, to expose Santos' fraud. Our competitive elections only work if each side keeps a check on the other side. Zimmerman was the last line of defense against Santos and he let the guy get past him.

It was a failure of the press on Long Island and here, in which we include the Daily News as well as our competitors at Newsday, the Post and the Times (in addition to TV, radio and on the web) to expose Santos' uncountable lies before the general election. Telling New Yorkers about Santos' fantasy life of accomplishment after the voting ended was too late.

Once he won the election, there were more failures. His failure to have shame prevented him from resigning when faced with his mountain of fabrications. The members of the House, mostly notably other New York freshmen like Democrat Dan Goldman and Republican Anthony D'Esposito then failed to have the patience to let the chamber follow its long tradition by agitating for expulsion without either a criminal conviction or a formal recommendation of the Ethics Committee.

Yesterday, was the failure of the full House to maintain its norms, even with very abnormal individuals like Santos, and break with history.

And there are more failures ahead, as Gov. Hochul must now schedule a special election, where voters are excluded from selecting the parties' candidates. The lack of Republican standard bearers will be determined solely by party bosses, the same party organizations that let Santos slip through.

New York should either have primaries in special elections or otherwise use nonpartisan contests. Either would allow all interested contenders to have their chance to win over voters.

Another wrinkle in this sad tale is that the Democrats are trying to get the state's highest court to order the congressional districts redrawn, setting up the possibility that the special election to fill Santos' seat in February would have different lines by the June primary. The court should just leave everything in place.

# Human intelligence must rule

...ys before Sam Altman was fired – and then rehired — as CEO of OpenAI, researchers at the company wrote a letter to its board of directors warning that a major new discovery could threaten humanity. We don't know about the details of that breakthrough or its role in the soap opera that's consumed the world in recent weeks, but we do know that AI intelligence is advancing at a rapid pace, that public policy to regulate it is moving at the...Washington.

...sorry, Dave. We're afraid we can't have that. ...can AI already do? As anyone who's fiddled with ChatGPT knows, it can write reasonably fact-based essays about fairly complicated ...s, and fiction and poetry to boot. It can ...mputer code. It can transcribe speech and ...ze long texts with remarkable accuracy. It ...rate photorealistic or stylized images of just ...ything. It can aid in the discovery of new ...s. It can take a picture or two of a human ...y age and identify it, almost instantly. It can ...a person for just a few seconds and then ...or her voice.

...rs are quick to point out the many failures ...es and foibles, all the ways in which the ...t yet ready for deployment. And it's true; ...orithm makes mistakes, and some make a ...AI-enabled innovation, the self-driving car, ...ust around the corner for many years now ...e the task has proven much more complex ...lly thought. (Even still, it's worth pointing ...autonomous vehicles have made major

...avoidable fact is that human beings have

developed and are refining a technology with remarkable capabilities. There's tremendous good AI can do today and tomorrow, from identifying students in need of additional support services, to helping radiologists detect cancerous growths, to supercharging drug development, to helping blind people make sense of what's in front of them, to quickly scoping out damage in disaster zones.

But like any technology, it can do serious damage as well. Those voice-spoofing capabilities are already being used to steal money. Artists are seeing their creativity exploited and new paintings or songs generated from copyrighted work without their permission. Deepfaked videos that, to the naked eye, are indistinguishable from real ones can throw fuel on fires of disinformation — or create nonconsensual pornography. And while well-designed, properly applied AI can help identify and combat human bias, poorly designed algorithms can enable mass bias in hiring, criminal justice and other realms.

It is the job of the federal government to prevent foreseeable AI abuses before they happen and design smart penalties for inevitable bad uses, all while ensuring that the are few if any constraints to AI's many beneficial applications.

The White House has released an organically intelligent framework for what sorts of safeguards are needed, and Senate Majority Leader Chuck Schumer has led the way. The billionaires who increasingly control this corner of the economy can't be trusted to regulate themselves. The tech-challenged men and women who play the biggest role writing our laws have their own ineptitudes and blind spots, but they're the only representatives we've got.

# Eric Adams and the invisible case

BE OUR GUEST
BY LEROY COMRIE
AND RUBEN DIAZ

When news of the federal investigation into Mayor Adams hit, it was met by New Yorkers everywhere with shock and concern. But in communities of color like ours, that concern quickly turned to skepticism:

That is because as the facts came out, the accusations against our mayor seemed more like a campaign than a case. So far it has been waged through anonymous leaks to the press without context, and seemed designed to undermine the mayor. And that is because the bar to convict in the court of public opinion is much lower than it is in an actual court of law.

If you are skeptical that we are skeptical, that is understandable. Perhaps you do not come from where we are from. Where we are from, injustice is more common than justice.

There are a lot of questions still unanswered. And certainly the headlines are compelling. But our point is, as the mayor said: wait before you hate. If you believe in justice, then seek the truth. We send this message to all New Yorkers — but especially to political opponents of the mayor, many of whom claim to be crusaders for justice, but who have hypocritically condemned him before a single shred of legal evidence has been presented.

Still unsure? Let's look at what we know so far.

Apparently there are two accusations — and we say "apparently" because neither the mayor nor anyone connected with him has even been formally accused of a crime, never mind indicted — that have been hurled at the mayor and his team, without a single on-the-record word from the federal government. The first is that the 2021 Adams campaign colluded with straw donors to arrange illegal foreign contributions from Turkey. No proof of this has been presented, but investigators seem to be looking at $14,000 in contributions made in May 2021 by members of a construction firm owned by Turkish-Americans.

But here is the missing context. $14,000 is a relatively small amount in an election in which about $18 million was spent in support of the mayor. What is the motive for the campaign to break the law for so little in return? And, again, no evidence has been presented that there is any connection between these contributors and the Turkish government, never mind the mayor.

The second accusation is that the mayor pushed the then-Fire Department commissioner via text when he was Brooklyn borough president to approve the opening of a new Turkish consulate building. But it has been reported that people who have seen the texts characterize the exchange as normal government work. It was also reported that then-Mayor Bill de Blasio's City Hall and others were pushing for the consulate to open on time even before Adams reached out to the FDNY.

As elected officials like us can attest, we all forward issues from constituents and constituencies to government agencies on a daily basis. What the agencies do then is entirely their call. So this is the breaking news equivalent of the sun rising in the morning. Not only is it not a scandal, it's routine. Not only is it not unethical, it's our job.

So why is this happening to the mayor? We don't know who is pushing this narrative on why. It is certainly possible that the investigators are just following leads because that's what they do, and others are seeking to frame an investigation as an indictment.

But it is also worth reminding New Yorkers about a few things. Last year, former Lt. Gov. Brian Benjamin — another African-American leader — was charged with a bribery scheme by the same federal office investigating Adams. They accused him of exchanging government favors for campaign contributions. The news was so damaging to his career that he had to resign. But months later, the federal government dropped the corruption charges because the facts did not meet the headlines.

This mayor has also spent the last year fighting the federal government on our behalf, demanding it pay its fair share for the migrant crisis that it created. Now the federal government is apparently targeting him. Whether or not these things are related, we cannot fairly say. But people in our communities are talking, and their skepticism is turning to anger.

So of course we are concerned he is being treated unfairly. But perhaps the thing New Yorkers should be most worried about is that, if another case against a high-profile person of color ends without clear evidence of a serious crime, the damage done won't just be to the mayor, but to our trust in justice itself.

*Comrie is a state senator representing Queens and Diaz is a former Bronx borough president.*

# City jails get new boss

## Adams picks Maginley-Liddie to lead as feds weigh takeover

**BY GRAHAM RAYMAN**
NEW YORK DAILY NEWS

Mayor Adams on Friday named a new correction commissioner, Lynelle Maginley-Liddie, who takes the helm of the agency that operates Rikers Island and other city jails as momentum builds for its takeover by the federal courts.

Maginley-Liddie, the second Black woman chosen to lead the agency, was the first deputy commissioner under her predecessor, Louis Molina, who is taking a newly created role as assistant deputy mayor under Deputy Mayor for Public Safety Phil Banks.

Adams said he interviewed several people for the post, but Maginley-Liddie stood out for her "emotional intelligence."

"She's the right leader for the right time," he said. "Lynelle has played a significant role in the progress we have made over the last 23 months at DOC. She is a steady hand, who will continue the good work of (Molina)."

Maginley-Liddie said she's ready to face the challenge of the possible federal takeover, which will play out in the courts over the next several months or longer.

"I humbly accept this position knowing the complexities which lie ahead," Maginley-Liddie said. She promised to work with the current federal court-appointed monitor, Steve Martin, who is tracking violence and staff use of force at Rikers Island and other city jails.

"We are going to work with the monitor. We have made significant progress under this administration and we will continue to build on the momentum," Maginley-Liddie said.

Martin, in a letter submitted to the courts on Friday, said he and his staff have worked with Maginley-Liddie "for many years and have developed a good working relationship with her during this time. In her work at the Department, the Monitoring Team has found the Commissioner to be transparent and forthright."

Martin and his monitoring team also said Maginley-Liddie's appointment "appears to reflect an attempt by the City to alter its approach by prioritizing transparency and by making a renewed commitment to consultation and collaboration."

Martin has repeatedly pointed out the Correction Department's "pattern of persistent interference, obstruction and lack of transparency."

Mayor Adams said Friday he sent Martin a list of correction commissioner candidates for review. The mayor also underscored his belief that things have improved and a receiver is unnecessary.

"We want to show good faith and good communication," he said. "We don't want to give the impression that communication has eroded to the point where we can't communicate.

"We can't continue to kick the can down the road. Show me where there's been a successful receivership in the



**Mayor Adams introduces Lynelle Maginley-Liddie as the new correction commissioner on Friday at City Hall.**

country," the mayor said.

Added city Corporation Counsel Sylvia Hinds-Radix: "We don't see what a receiver can do better than what the city has done."

Lawyers for jail detainees filed a motion in Manhattan Federal Court on Nov. 17 arguing that the city is incapable of fixing the jails, and a federal court-appointed receiver should be named to oversee the system.

On the same day, the Manhattan U.S. Attorney's office filed a letter confirming it also backs receivership. Attorney General Letitia James and public defenders, jail rights groups, nonprofit organizations and former city officials filed amicus briefs in favor of receivership on Dec. 1.

Five members of the nine-member city Board of Correction also back a receiver. Three other members of the board appear to oppose a takeover, and a new appointee to the board has not stated a position on the issue.

Responding to Maginley-Liddie's appointment, the Legal Aid Society said, "The current deteriorated state of the Department of Correction is well past the ability of a single commissioner to correct, and only an independent body in the form of a receiver can secure the necessary systemic changes."

Correction officers union president Benny Boscio lauded the "productive" relationship he has had with Maginley-Liddie. "Obviously, we are living in one of the most challenging times in the history of

our agency and these difficult times call for strong leadership from someone who knows our jail system very well," he said.

Maginley-Liddie will be challenged on a second front beside the possibility of a federal takeover. Under city law, Rikers Island is to close in 2027 and be replaced with construction of four new jails to be built at a cost of roughly $9 billion. A new Brooklyn jail — the first scheduled to be completed — is already two years behind schedule.

Adams described some conditions in the jails as "deplorable."

"We have found ourselves in this space where we can't use capital dollars because of the close-Rikers plan," he said.

In tapping Maginley-Liddie, Adams passed over a number of current and former correction officials with deep knowledge of jail operations.

One of those was Charles Daniels, who Molina brought in in September as senior deputy commissioner. Daniels had been director of prisons in Nevada until he fell afoul of Gov. Steve Sisolak over a prison escape.

On Oct. 23, Daniels got into an argument with Martin and threatened to sue him, a Nov. 8 monitor report said.

One of Maginley-Liddie's responsibilities as first deputy commissioner has been oversight of the Health Management Division, which tracks officers out on sick leave. In a Oct. 28, 2022, report, the monitor said an independent review of the division found "significant mismanagement

and corruption, poor staff supervision a staff practices."

In a subsequent report July 10, t monitor noted the division embarked a "significant overhaul to reduce abu and things had improved.

As the second Black woman to serve correction commissioner, Maginley-L die was preceded by Jacqueline McMi ens, who served in the post from 1984 1986 under Mayor Ed Koch.

Maginley-Liddie immigrated to the U from Antigua 20 years ago to go to 1 school, she said. She was a lawyer in p vate practice before she was hired by then-Correction Commissioner Cynt Brann in 2015 as an agency attorney m ing $89,000, city payroll records show.

She was promoted to executive agen counsel in 2017 and her salary rose $234,300 in 2021, city payroll reco show.

Brann promoted her to chief diver officer in 2020 and first deputy c missioner in January 2021, where s remained through the tenures of Vinc Schiraldi and Molina, her Correction states.

Her husband, Michael Liddie, is senior policy adviser at the city's partment of Citywide Administrati Services, according to his LinkedIn pa He previously worked at the Correct Department from 2015 to 2018 as direc of human resources, the page states.

The couple lives in Manhattan and two children.



Jonathan Majors at court in his domestic assault trial. On Friday, a text he wrote to accuser in a previous incident appears to be trying to deter her from going to hospital. AP

# MAJORS' TEXTS READ

## Warns accuser of pitfalls of going to hosp in prior incident

**BY MOLLY CRANE-NEWMAN**
NEW YORK DAILY NEWS

Manhattan Criminal Court jury on [...] saw old text messages sent by Jona-[...]Majors appearing to show the "Creed [...]tor admitting to assaulting his ex-girl-[...]

Grace Jabbari in the U.K. months [...] the incident for which he is on trial. [...]ear you have no perspective of what [...] happen if you go to the hospital. They [...]k you questions, and as I don't think [...]tually protect us, it could lead to an [...]igation — even if you lie and they sus-[...]omething," Majors texted Jabbari on [...]22, 2022, according to evidence read [...] court.

[...]bari, who was living with Majors in [...]n at the time, responded: "I would [...] doctor I bumped my head if I go. [...]ing to give [it] one more day, but I [...]leep, and I need some stronger pain-[...] Why would I tell them what really [...]ned when it's clear I want to be with [...]

[...]ors, 34, has pleaded not guilty to mis-[...]nor assault and harassment charges [...]ng up to a year in jail for a March 25 [...]t during which prosecutors allege

he assaulted Jabbari, fracturing her finger and inflicting cuts and bruises as they argued in the back seat of a private car driving through lower Manhattan.

Judge Michael Gaffey previously ruled the texts were inadmissible. He permitted their introduction after Majors' lawyer, Priya Chaudhry, grilled his alleged victim about not reporting him to police.

Gaffey said the forceful line of questioning opened the door to the old texts relating to Jabbari's feelings about contacting authorities and told the jury to consider them as background.

Part of another text Majors sent to Jabbari said: "Last night I considered killing myself versus coming home. I need love, too, or maybe I'm such a monster and horrible man that I don't deserve it and should just kill myself."

In another message berating Jabbari, the actor said he was incapable of love.

When Jabbari, a British choreographer, broke into tears reading the texts during her fourth day on the witness stand, Manhattan Assistant District Attorney Kelli Galaway finished the exchange.

"I would not go to the doctor if you don't feel safe with me doing so. I understand

your fear," Jabbari wrote Majors in another text.

The messages were added to the record without additional context.

But prosecutors shed some light on them in an October court filing that included an itemized list of evidence, including photos of a hand, shoulder and buttocks taken on Sept. 22 and texts about "punching" and "discussing pain."

The filing cited U.K. hospital records and a report by the London Metropolitan Police. British authorities told Rolling Stone in November an investigation is ongoing

Prosecutors allege the March incident featured in a "cruel and manipulative pattern of psychological and physical abuse" during the couple's 19-month relationship. Jabbari previously testified that Majors, a star in Marvel movies, ripped her headphones out of her ears and broke them when he became angry she'd gone out with a friend days before the exchange she read in court.

Majors filed a countercomplaint against his ex months after the March incident in Manhattan, alleging Jabbari had assaulted him during the car ride. That complaint

led to Jabbari's brief arrest in October. The Manhattan DA quickly declined the case.

The couple went their separate ways after the March argument spilled onto the street, jurors have heard, with Jabbari going out for a few hours with strangers who inquired about her well-being and Majors staying in a hotel.

Majors called police the morning after their confrontation when he arrived home to the couple's Chelsea penthouse and reported he found her unconscious on the floor of a walk-in closet. Jabbari has said she took some over-the-counter sleeping pills in the hours before she was found in the closet.

NYPD Officer Brendan Swayne, a domestic violence prevention cop at the 10th Precinct, took the stand later Friday, walking the jury through body-worn camera footage from when he responded to the 911 call.

"Based on what we had so far, I knew bare minimum there'd be a domestic incident report filed," Swayne said. "There was a domestic incident that had occurred."

Next week, jurors are expected to hear from the driver of the car in which Majors and Jabbari had their confrontation.

2

I ask The courts To work with me Because so much have happen To me I cant remeber Actzacu Dates

undr Dockit 22 Civ 638 (JPO)(GS) officer william Pratt and other officers physicaly attack me in AMKC c95 Rikers Island hallway I receive a physical injuries To my Legs and Back The medical Doctor had Doc staff Take me To a uNit and put me on The floor of a cell

Then after I was in c-95 on The floor of a cell for Days may Be months I was Sent To GRVC mental health unit and place on a floor There a officer There 22cv913- Attack me ealled me Nigga and another inmate Nigga I was on The floor Because my Legs my injurys from pratt medical would Not give me any MEDICAL treatment The officer Attack me stated he was going To make me walk This was in GRVC medical and metal health coverd That up I Told medical I Need out Side medical Treatment cover up By medical and mental Health again

3

Let me put This right with The courts
I Dont Take medication for mental illness
for religious resince

mental health after me Being on The floor
of The cell for Days I was sent
To Bellevue Hospital MENtal hedward There
I was seen By a Specialty Neurology Doctors
I was given Test By 4 Doctor That came up
with The Same diagnoses Chronic Nerey
damge To my Legs They Told me I will Be
give more Test Tomoro That same Day DOC
Staff Tuke me out The room of The hospital
and Tuke me Back To Rikers Island
Be for any more Test can Be Taken

I was Taken Back To BRVC The Doctor
from medical Told Doc Staff To Take me
Back To The UNit put him Back in acell
I was put Back in acell on The floor
That when I Started writing up a
Lawsuit of me Being Attack By The CO That called
me Nigga and use mace on me and Beat me
up and he was also Disrspecting my food
and metal Health now aBout it

4

all of This happen To me Because I reported a Rape on me in 2020 Nov 15 it was a Big cover up at The high Level of Doc when I reported it The officers Tryed To entered The cell I was in To Kill me or Shut me up when I got infront of The Doctor he Tryed To Send me Back To my cell Telling me he will put it in my medical File I was going To Kill him he seen it in my eye's

The officer That Rape me I Don't want The money I want justices

There was a lot of other inmates That was Sexually assaulted To By officer Back Then Rikers Island Health and hospital Doctor and Staff mentel health and mental health Doctor was giveing inmates medieation To Shut Them up The medication put you in a State when you cant Thank Therewas a lot of Rapes Being coverd up By Doctors and Staff at " a high LEVEL other inmets Should receive JUStice To "

5

The courts Need TO UNDer Stent
I cant lie There are Video Camers
evry where in here There Not in Showers
or cells Bathrooms evry Thing in here
is Beinglook at on video There Trying
To Find a way To kill me and get
away with it Because The officer
That Rape me in 2020 DiD it on video
I reported it So How DiD he getaway
with That I reported it To a Lawyer
Name MATTHEW B WALLER he ordered The
medical record From Doc when he received
it, it indicated The Rape Never happen
Thank God I whent To a out Side Hospital
and Not Back To my cell like I was Told To Do
The Doc Heath and hospital Tryed To
send me Back To a cell if I would
Not have Told The Doctor if you Dont
send me To a out Side Hospital Im going
To Kill you and justifineit I would have
Ben a victim That would Not Be able
to Tell my Sorry Because who wood
Beleve me see 5-1

I would Not lie To The courts
call WALLER and see if I'm lieing
at 212-766-4404 about The Fake medical
records

5-1

Re: Report of Sexual Assault/Request for Video Preservation, Robert Murray
007800, SID: 06093686K, AMKC

Lopez, Ginger <MGLopez@legal-aid.org>

Thu 11/12/2020 2:25 PM

To: sarena.townsend@doc.nyc.gov <sarena.townsend@doc.nyc.gov>;'Rubin Benitez'
<Rubin Benitez@doc.nyc.gov>;
'Heidi Grossman@doc.nyc.gov' <Heidi.Grossman@doc.nyc.gov>;'Brenda.cooke@doc.nyc.gov'
<Brenda.cooke@doc.nyc.gov>;'Tara.Daggett@doc.nyc.gov'
<Tara.Daggett@doc.nyc.gov>;'constituentservice@doc.nyc.gov'
<constituentservices@doc.nyc.gov>;'complaints@doc.nyc.gov' <complaints@doc.nyc.gov>;Ariba Friedberg
<afriedberg@tillidgroup.com>

I write on behalf of Mr. Robert Murray, 895-20-00700, who reports that he was sexually assaulted by a
correction officer on Saturday, November 14th between the hours of 6 and 9A.M. in the AMKC receiving
room.

Mr. Murray says before the sexual assault he was having a disagreement with correction officers
regarding the distribution of cereal. Mr. Murray says after the disagreement he was then escorted to the
receiving room in AMKC and stripped searched. He says then in the presence of a female officer, a male
officer put a condom on and told Mr. Murray, "this is what we do to gangsters" and proceeded to
sexually assault him.

Mr. Murray says he was taken to Bellevue Hospital where a rape kit was administered and according to
Mr. Murray, there was evidence that he had been sexually assaulted. Mr. Murray says he was bleeding
through his rectal area and in severe pain for several days.

Mr. Murray says he was interviewed by the Inspector General and provided a statement regarding the
sexual assault. Mr. Murray says that there was a camera in the receiving room that captured the assault
and he is requesting that the video be preserved for future litigation.

Would you please ensure that all video footage, before, during and after the above reported sexual
assault that occurred on Saturday morning, November 14th, in the AMKC receiving room be preserved
for possible future litigation?

Please inform me of your actions in response to this request.

Thank you in advance for your attention to this matter.



Mayzabeth Ginger Lopez
Paralegal Casehandler

Prisoners' Rights Project
The Legal Aid Society
199 Water Street 6th Floor
New York, NY 10038

7

Claim (6) Then I call Ginger Lope when I got Back To The Facility she sent a complaint To Doc To preserved The Video Footage of That area from Nov 14, 2020 during and after So The Tape Should Be preserved of me coming in and going out So They should have The Tape From Nov 14, 2020 To Nov 15, 2020 and I was sent out The Facility on Nov 16, 2020 To Bellevue ———— Hospital

Legal Name Leviticus Before Lucfer Slave Name Robert Lee murray

Robert murry Leviticus Louc

6

officer Snatch me out my cell in AMKe
Tuke me To westFAC and Tryd TO Kill
me I was put in a cell, April 28, 2023
I was left without food and water For
11 Days I was Taken out The cell with cut
arms and unresponsive Order The Videos
From DOC and Health and Hospital Doc
had Somthing TO DO with That TO Because
westFAC. is a medical jail all my Legal work
wast Stolen and all my property was Never
seen again See 6-1

Then on 10-24-23 in GRVC I came
out my cell with my Ben with my
Legal work in it and Books To The TaBel
officers came with inmates around
me inmate griffin pick up my Book
and Tryd TO rip it up I ran after him
got my Book Beck and Then inmate MOORE
cameup and Startd riping up my Books
I Tryd TO Beau him away By useing The
Ben him and The officers came after me
MOORE was a Big guy his ASSAULT On
me was like NO other when I Tryd
To Defend my SIfe officer jane DOE
Sprayd me with mace at The Same
Time MOORE was attacking me

6-1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

ROBERT MURRAY,

                Petitioner,

v.

CITY OF NEW YORK,

                Respondent.

Index No. 154266/2023

**VERIFIED PETITION FOR PRE-ACTION DISCOVERY AND PRESERVATION WITH TEMPORARY RESTRAINING ORDER**

Petitioner ROBERT MURRAY, by his attorneys at Rickner PLLC, alleges the following in support of his Petition seeking to compel pre-action discovery and preservation pursuant to Civil Procedure Law and Rules ("CPLR") § 3102(c):

## NATURE OF THE PROCEEEDING

1.    This special proceeding arises from the violations of the civil and common law rights of Petitioner Robert Murray ("Petitioner" or "Mr. Murray") by the City of New York ("City") and its agency, the New York City Department of Correction ("NYCDOC").

2.    Respondent repeatedly, over the course of eleven (11) days, violated Mr. Murray's rights when its agency and employees at NYCDOC verbally harassed, assaulted, and starved him, leading to his current hospitalization at Bellevue Hospital.

3.    Petitioner has made no previous application for the relief requested herein.

## PARTIES

4.    Petitioner resides in the state of New York and is currently within the custody and control of NYCDOC.

5.    Respondent City is a municipal corporation duly incorporated and existing pursuant to the laws of the State of New York. It is authorized by law to maintain a corrections department, NYCDOC, which acts as its agent in the area of law enforcement and corrections for which it is

ultimately responsible. Respondent City assumes the risks incidental to the maintenance of its correctional facilities. Respondent City's principal place is business is in New York County

## VENUE

6.    Venue is properly laid before this Court pursuant to C.P.L.R. § 503(c) as the Respondent's principal place of business is in the County of New York.

## STATEMENT OF FACTS

7.    On or about Wednesday, April 26, 2023, Mr. Murray was threatened, assaulted, and pepper sprayed by a Captain and correction officer ("CO") in cell C95, Quad 4 Upper, Anna M. Kross Center ("AMKC") on Rikers Island. The officers left Mr. Murray in his cell and did not take him to get decontaminated.

8.    At some time between 2:30 a.m. and 3:00 a.m. on the morning of Thursday, April 27, 2023, a group of approximately 5-6 masked COs with shields opened Mr. Murray's cell and assaulted and pepper sprayed him. At this point, Mr. Murray was unable to walk, so the officers placed him in a wheelchair and transported him to Hart's Island. Mr. Murray was held on Hart's Island for approximately 12 hours, until the afternoon of April 27, 2023.

9.    Mr. Murray was then transported to medical at the Vernon C. Bain Center ("VCBC") and from there, transported via ambulance to Lincoln Hospital.

10.    The doctors at Lincoln Hospital recommended that he be taken to Bellevue Hospital. Once at Bellevue, Mr. Murray was treated, and his doctors ordered that NYCDOC provide Mr. Murray with a wheelchair.

11.    On April 28, 2023, Mr. Murray was transported from Bellevue Hospital back to Rikers, and this time, was taken to West Facility. Mr. Murray was dragged off the bus by a group of COs with shields and placed in a cell, where the officers proceeded to assault him and cut up

his arms. The cell Mr. Murray was placed in had no running water and the toilet was clogged with urine and feces. Mr. Murray asked for help, telling the officers he was bleeding, but no medical care was provided.

12.    For two days, from April 28, 2023 through April 30, 2023, for meal times, COs would place food trays just out of reach in front of Mr. Murray's cell. By Sunday, April 30, 2023, the officers stopped taunting Mr. Murray with the prospect of food and simply left him without food or water.

13.    Mr. Murray was left without food, water, or medical attention until May 6, 2023, when he was found unresponsive in his cell. He was rushed to Elmhurst Hospital and then transported to Bellevue Hospital, where he is currently being treated.

14.    Mr. Murray does not remember much about what happened before he was found unresponsive, other than the fact that he begged officers for water and was denied on every occasion.

15.    Given the current state of affairs on Rikers Island—including severe mismanagement, abuse of authority, chaos, violence, and dilapidated facilities in which document retention has proved inconsistent, at best—the preservation and early discovery of certain records is necessary to preserve the rights of Mr. Murray in anticipation of future civil rights litigation.

16.    To this end, Petitioner seeks an Order compelling the City of New York to immediately produce to Petitioner:

        a.    C95, Quad 4 Upper, Anna M. Kross Center ("AMKC") on April 26, 2023 and April 27, 2023; and,

        b.    Mr. Murray at West Facility on April 28, 2023 through May 6, 2023;

17.    Petitioner further requests an Order compelling the City to preserve the following:

        a.    **All surveillance footage of Robert Murray and his movements from April 26, 2023 to May 6, 2023**, including but not limited to:

3

1. the surveillance footage described above;
2. Surveillance footage of Mr. Murray's transport from AMKC to Hart's Island on April 27, 2023;
3. Hart's Island from 12AM to 3PM on April 27, 2023;
4. Surveillance footage of Mr. Murray's transport from Hart's Island to Vernon C. Bain Correctional Center ("VCBC") on April 27, 2023;
5. Outside, immediate entrance, intake area, and medical facility of VCBC on April 27, 2023 from 3PM to 12PM and on April 28, 2023; and,
6. Surveillance footage of Mr. Murray's transport from VCBC to West Facility on April 28, 2023.

b.   All logbooks for C95, Quad 4 Upper, AMKC on April 26, 2023 and April 27, 2023; Hart's Island on April, 27, 2023; VCBC on April 27, 2023 and April 28, 2023; and West Facility from April 28, 2023 to May 6, 2023;

c.   The personnel and disciplinary records of all DOC staff on duty in Quad 4 Upper, AMKC on April 26, 2023 and April 27, 2023; Hart's Island on April, 27, 2023; VCBC on April 27, 2023 and April 28, 2023; and West Facility from April 28, 2023 to May 6, 2023; and,

d.   Any and all complaints, grievances, or other correspondence received by the DOC from Mr. Murray since his entry on Rikers, including all appeals and responses all written requests for involuntary or voluntary protective custody; audio, video, or photographs taken in connection with any reported assault; any PREA reports and related records made by or on behalf of Mr. Murray; all incident or injury reports; medical records; transport records; internal or external investigation records into these incidents; movement records; any and all other records related to any allegation of assault against Mr. Murray, including, but not limited to, the incidents occurring from April 26, 2023 through May 6, 2023 in the various areas of Rikers Island/at the times outlined above.

### ARGUMENT

5.     Petitioner has stated a claim and is therefore entitled to pre-action disclosures pursuant to C.P.L.R. § 3102(c), and an Order compelling the City of New York to suspend all destruction of relevant evidence and preserve the same in anticipation of civil rights litigation.

**A.    Petitioner is Entitled Pre-action Disclosure of Relevant Surveillance Footage**

6.     Pursuant to CPLR 3102(c), the Court may order the pre-action disclosure or preservation of records in order "to aid in bringing an action."

4

7.      "Pre-action discovery is available . . . 'where a petitioner demonstrates that [it] has a meritorious cause of action and that the information sought is material and necessary to the actionable wrong.'" *Sandals Resorts Int'l Ltd. v. Google, Inc.*, 86 A.D.3d 32, 38 (1st Dep't 2011) (quoting *Bishop v. Stevenson Commons Assoc.*, L.P., 74 A.D.3d 640, 641 (2010)).

8.      If a Petitioner demonstrates that a cause of action exists and the information sought is necessary for the pursuit of those claims, pre-action discovery is appropriate. *See Rosenberg v. Brooklyn Union Gas Co.*, 80 A.D.2d 834 (2nd Dep't 1981) ("Since petitioners have demonstrated that a cause of action exists, C.P.L.R. § 3102(c) would authorize pre-action discovery to allow them to frame their complaint"); *Bumpus v. NYC Trans. Auth.*, 66 A.D. 3d 26, 33 (2nd Dep't 2009).

9.      In *Sokolova v. City of New York*, the Honorable Leslie A. Stroth ordered the City of New York to produce several items in the petitioner's motion for pre-action discovery, including video recordings, after he had been assaulted while in NYCDOC custody. 180 N.Y.S.3d 833 (N.Y. Sup. Ct. 2022). The petitioner was attacked by another incarcerated individual while in AMKC, Rikers Island and suffered from a traumatic brain injury, partial paralysis, and limitations in vocal functions. 180 N.Y.S.3d at 835. The Court reasoned that in this case, "where the complainant is unable to speak or report any of the details of the subject incident, certain pre-action discovery is warranted" to enable the petitioner to frame his complaint and identify additional defendants and/or witnesses. *Id.* at 832.

10.      Here, Mr. Murray does not remember and/or was unconscious for a large portion of his time at West Facility. Furthermore, the "incident" was not quick – it was eleven days of interactions and assaults involving many people in many different areas of Rikers Island. Through the prompt production of surveillance footage, Mr. Murray seeks to better understand the circumstances of how he ended up beaten, dehydrated, and starved in order to properly frame his

pleadings and properly assess the City's liability.

11.     Moreover, given the particularly severe mismanagement and abuse of authority on Rikers Island, an Order compelling production of this video is the most efficient and safest way to ensure that the video is not only preserved, but in the hands of Petitioner's counsel, who is diligently working to properly identify any potential individual defendants and frame the pleadings in anticipated civil rights litigation.

**B.     Petitioner is Entitled to a Temporary Restraining Order Preventing the Destruction of Relevant Evidence and Ordering the Immediate Preservation Thereof**

12.     In addition to allowing limited pre-action discovery, CPLR 3102(c) also provides an avenue to "preserve information." Where, as here, relevant evidence has the potential to be lost or destroyed in the regular course of business, court-ordered preservation is proper. *See Application of Loria*, 98 A.D.2d 989, 989 (4th Dep't 1983) (ordering preservation of evidence related to police officer's shooting of the petitioner).

13.     Petitioner faces imminent and irreparable harm should this Order be denied and the above enumerated evidence, as a result, is spoliated, lost, or destroyed. In counsel's experience, the NYDOC typically deletes surveillance footage every 30 days.

14.     Video preservation is particularly important in cases such as this, where video may be the only non-testimonial evidence available concerning what happened to Mr. Murray while he was incapacitated. Thus, preservation of the relevant footage is necessary to protect the Petitioner's rights.

15.     To ensure the requested evidence is preserved, Petitioner respectfully requests that the City of New York be immediately enjoined from deleting or destroying any of the requested evidence pending civil rights litigation.

16.     To ensure that any such Order is honored, Petitioner also requests that the Court

6

order Respondents to an affidavit indicating to whom the Preservation Order was delivered to hold the City accountable if evidence is later missing or destroyed. *See e.g. In the matter of Mercado v. The City of New York*, Index Number 17888/2013, (Sup. Ct. Kings Co. Nov. 1, 2013).

17.    No party would be prejudiced by this Court ordering the preservation of information and production of evidence referred to in the Order to Show Cause, and Petitioner has made a good faith attempt to notify the respondents of the time, date, and place of the instant application in order to provide the City an opportunity to appear in response to the instant application. *See* 22 NYCRR 202.7(f).

18.    Notification was made by emailing the City of New York's service address, ServiceECF@law.nyc.gov, on May 10, 2023, with a copy of the Proposed Order to Show Cause and this Affirmation in Support of the Petition.

Dated: New York, New York
       May 10, 2023

<div align="right">

Rickner PLLC

By:

Sara Wolkensdorfer
14 Wall Street, Suite 1603
New York, New York 10005
Phone: (212) 300-6506
Fax: (888) 390-5401
*Attorney for Plaintiff*

</div>

7

## ATTORNEY'S VERIFICATION

I, Sara Wolkensdorfer, an attorney duly admitted to practice before the Courts of the State of New York, affirm the following to be true under the penalties of perjury:

(1)    I am the attorney of record for the Petitioner.

(2)    I have read the annexed Petition and know the contents thereof, and the same are true to my knowledge, except those matters therein which are alleged upon information and belief, and as to those matters, I believe them to be true. My beliefs, as to those matters therein not stated upon knowledge, are based upon facts, records, and other pertinent information contained in my files.

(3)    This verification is made by me because Petitioner does not reside in the County where counsel maintains offices.

Dated: New York, New York
       May 10, 2023

Rickner PLLC

By: _____
    Sara Wolkensdorfer

14 Wall Street, Suite 1603
New York, New York 10005
Phone: (212) 300-6506
Fax: (888) 390-5401
*Attorney for Plaintiff*

7

~~thing~~ I was Knock To The Floor were moore injurd my Legs This was on 10-24-23) 8-9 in The morning Lock out Time I was Taken To medical on a gerny I was Taken TO GRve heart Island and place in a cell on The gerny with NO Medical Treatment my injuries had me in pain C.O Pratt was There Thay left me in The cell all night on The gerny Pratt Try To make me injuring report That was Dated for 10-25-23 By a Doctor That was NOT Theon 10-24-23 and The Doctor put The report as a SLip and fall a Bump my head and pratt was Trying To make me sign it This was 10-25-23

~~they~~ The Doctor TOld Them I haft To sign it in order for it to work They was going TO Kill me I would Not Sign The Doctor Told Them TO Take me Back TO my cell I Kept Telling The Doctor I Need out Side medical Treetment This was on 10-25-23 When I got Back TO my cell all my legal work was gon and all my Books was Ripe up inmate mooRE Told me The officers Toke all my Legal work They had me as a cell lock in/Ded Lock

8

On The morning of 10-30-23 a Officer came To my cell and Told me I had Bronx court I Told him I Need medical They Open The cell capt. had on Body Cam on I told him I minurd and in Need of medical Do To The Swelling in my Legs Do To my injurys I was put on a chair and push To medical

I got To medical and in from The Doctor of my injurys and Told him I Need To see a out-Side Doctor for x-rays To my Faceshel area I Beleve I have a Broken Bone at This Time capt. Tolerver and a Nother officer was The officers That was There The Doctor walk out The officer At This Time capt and The officer came in and push me out OF The area To The receving room area

9

I Told The Capt. in The receving room I Need medical he orderd The officers To Drag me on TO The court Bus I Layd There on The floor of The Bus into I got TO court when I got TO court There was a capt That came on The Bus I inform him I Need medical Im a injured inmate

I was sent TO Lincoln Hospital where I was seen By a Doctor I informd her I was Assaulted on 10-24-23 I was in a cell on Rikers Island injurd and The medical Doctor and co at The Island refuse TO send me TO a outside provider for Treatment This was 10-30-23

She orderd x-rays To my face shel area and seen The swelling in my Legs She informd me I had a Broken Nose and she see my medical records That shose I have Nerv dange Legs and She Beleve Im in Need of a wheelchair This on 10-30-23

10

When The Tore chang in The Hospital
Doc Sent officers TO The Hospital
TO Drag me out with out The wheelchair
The Doctor gave me paper work
That Told
Rikers Island TO give me Back The
chair Thay Tuke from me Because
I was in Need of it

When I got Back TO Rikers
The Doctor ~~Ne~~ icknord ~~Bb~~ Doctors
~~order~~ order at The Lincoln Hospital
and Told DOC STAFF TO Take me
Back TO The mental health unit
and put me Back in a cell on
The Floor

Then I wrot The court under
a Nother inmate Name Because Thay
would NOT Send out my mail Days
After I was moove to a medical
Unit and given a chair But I
was in That cell For aBout a month in a 1/2
on The Floor with out medical
and in pain and was Being refused
my medication after I was Seen
By an outside Doctor and They was Told
TO provid medical which They DiD Not
I was on Floor of cell From 10-25-23 TO 12-8-23 See 10-1



# AFTER VISIT SUMMARY

NYC
HEALTH+
HOSPITALS | **Bellevue**

**Robert Murray**  MRN: 1140081

📅 12/8/2023  📍 Bellevue ED ADULT 212-562-4141

## Instructions

You need to have a wheel-chair because of our neuropathy. You should also receive all medications listed:

The gabapentin dose is 600 mg twice daily plus 900 mg nightly.

**Current Outpatient Medications**

| Medication | Instructions |
|---|---|
| • bictegravir-emtricitab-tenofov (BIKTARVY) 50-200-25 MG per tablet | 1 tablet, Oral, Daily |
| • divalproex (DEPAKOTE) | 500 mg, Oral, 2 times daily |
| • gabapentin (NEURONTIN) | 900 mg, Oral, Nightly, 600 mg twice daily and 900 mg nightly |
| • Gabapentin (NEURONTIN) | 600 mg, Oral, 2 times daily, 600 mg twice daily and 900 mg nightly |
| • haloperidol (HALDOL) | 5 mg, Oral, 2 times daily |
| • lidocaine (LMX) 4 % cream | 1 Application, Topical, As needed |



**Call Patient Does Not Have A Pcp**
Specialty: Internal Medicine
Contact: 55 Water Street
          New York NY 10041



**Call Bellevue Neurology**
Specialty: Neurology
Contact: 462 1st Ave
          New York New York 10016
          844-692-4692
Ambulatory Building
1st floor Desk 1B

990 2300038

## Today's Visit

You were seen by Dr. R White, MD and Dr. J Avigan, MD

**Reason for Visit**
Leg Pain

**Diagnosis**
Neuropathy

⚕ **Medications Given**
gabapentin (NEURONTIN) Last given 12/8/2023 2:33 AM



HON. SYLVIA O. HINDS-RADIX
*Corporation Counsel*

**THE CITY OF NEW YORK**

**LAW DEPARTMENT**

100 CHURCH STREET
NEW YORK, NY 10007

JESSE N. ZILINSKI
*Assistant Corporation Counsel*
Phone: (212) 356-2381
Fax: (212) 356-3509
Email: jzilinsk@law.nyc.gov

December 15, 2023

**VIA E.C.F.**
Honorable Lewis J. Liman
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

       Re:    Robert Lee Murray v. City of New York, et al.,
               21 Civ. 6718 (LJL)

Your Honor:

      I am an Assistant Corporation Counsel in the Office of the Hon. Sylvia O. Hinds-Radix, Corporation Counsel of the City of New York, and the attorney for Defendant City of New York ("City") in the above-referenced matter. The City respectfully writes in response to the Court's December 8, 2023 Order requiring it to respond to Plaintiff's December 6, 2023, letter. (See ECF No. 75.)

      By way of background, Plaintiff initiated this action on August 9, 2021, alleging that on November 16, 2020, he was raped by a correction officer in the presence of at least seven other correction officers and a female captain on Rikers Island. (See ECF No. 2.) Plaintiff then alleges he was placed in a cell where "the officers that sexually assaulted" him entered the cell and Plaintiff threw feces at them until "they retreated . . . ." (See ECF No. 59.) After the alleged sexual assault, Plaintiff states that he was taken to Bellevue Hospital on November 16, 2020, where a rape kit was performed indicating a sexual assault. (See id.)

      On August 17, 2021, the Court issued a Valentin Order, requiring the City to identify the "John Doe" individuals (including the female captain) in the Complaint. (See ECF No. 7.) The City requested, and Plaintiff repeatedly failed to provide a medical release for his Bellevue Hospital records in order to fully exhaust all avenues to identify the "John Doe" individuals. On August 8, 2023, the City filed a status letter that indicated it was in possession of a Use of Force Report from November 15, 2020, that included the names of three correction officers involved in an incident with Plaintiff. (See ECF No. 65.) The Use of Force Report did not involve sexual assault, but rather that Plaintiff assaulted three correction officers with bodily fluids in similar circumstances described in the Complaint. (See id.) This would mean that the alleged sexual assault occurred on November 15, 2020, not November 16, 2020. The City indicated that it would not identify these individuals where Plaintiff alleges sexual assault by seven correction officers

while the Use of Force Report only includes three correction officers without more information such as physical descriptions including height, weight, apparent race, eye color, hair color, and/or facial hair. (See id.)

On August 21, 2023, the Court ordered Plaintiff to provide Defendant with a proper release by September 18, 2023, or show cause as to why Defendant should not be relieved of complying with the Valentin Order or why Plaintiff should not be required to produce the medical records. (See ECF No. 66.) On September 18, 2023, Defense counsel received a release signed by Plaintiff on August 31, 2023. The release only allowed the City to obtain medical records from Bellevue Hospital from November 16, 2020, the alleged date he was taken to Bellevue Hospital, and the City executed the release and subpoenaed the medical records on October 18, 2023. Plaintiff references this subpoena in his December 6, 2023, letter. (See ECF No. 74.) The City received the medial records and noted in its November 6, 2023 status report that the medical records did not assist in identifying any individuals Plaintiff alleges sexually assaulted him, other than providing contemporaneous statements that Plaintiff reported he was raped by one correction officer while four others threatened him. (See ECF No. 72.) In contrast with Plaintiff's allegations, however, the medical records state that his evaluation "was not sufficient to show that sort of sexual assault the patient was reporting."

On November 7, 2023, the Court ordered Plaintiff to provide descriptions of the "John Doe" defendants by November 29, 2023. (See ECF No. 73.) Plaintiff filed a letter on December 6, 2023, providing some descriptions of the "John Doe" officers and making separate allegations of a use of force in October 2023. (See ECF No. 74.) The Court then ordered the City to respond to this letter by December 15, 2023, and "to include in that response the results of the City's inquiries into the events recounted in Plaintiff's letter." (See ECF No. 75.)

The City inquired into the identity of the individuals that would have performed strip searches on November 15, 2020. DOC informed the City that strip searches in the main intake area are conducted by correction officers assigned to an intake post and in the presence of a captain. Based on the legal schedule, DOC provided the City with the names of seven correction officers who likely would have performed a strip search and provided photographs of the individuals for comparison with Plaintiff's descriptions. One of the three correction officers from the November 15, 2020 use of force report matches the name of an individual DOC provided of individuals likely to have performed a strip search.

Plaintiff alleges that the captain who watched the sexual assault was a Hispanic female. The assigned captain on November 15, 2020, however, was an African-American man, who was also the investigating supervisor for the use of force where Plaintiff assaulted staff with feces. Plaintiff alleges that the "John Doe" correction officer who raped him was tall with dark skin and young, between the ages of twenty-five and thirty. (See ECF No. 74.) Five of the seven individuals (including the captain) on the intake posts were African-American men and two of those five were between twenty-five and thirty, including one mentioned in the November 15, 2020 use of force report. Plaintiff alleges that the correction officer holding the mace was "a older white C.O." (See id.) There was another who was of Hispanic descent. (See id.) The legal schedule and photographs provided to defense counsel confirm that one of the correction officers was Caucasian and one appears to be of Hispanic descent, both between the ages of twenty-five and thirty.

The City further investigated whether there were any Hispanic female captains scheduled to work on November 15, 2020, around the time Plaintiff alleges he was assaulted. Upon information and belief, there were twelve female captains scheduled to work on November 15, 2020, and all of them appear to be African-American.

Regarding Plaintiff's allegations in the letter that an inmate was sent after him on October 25, 2023, the City has investigated this incident and obtained a use of force report. The report indicates that a correction officer witnessed Plaintiff and another inmate arguing and attempted to stop the argument from escalating. Both inmates became irate, and Plaintiff threw an object at the other inmate. A third inmate then began ripping Plaintiff's books, and Plaintiff and the third inmate then began to physically fight each other. The correction officer used chemical agents to break up the fight. Plaintiff then fell to the floor and refused to get up, requiring three correction officers to lift him onto a gurney before being taken the clinic.

The City was unable to obtain information regarding Plaintiff's allegation that he suffered from a broken nose and was taken to the hospital because it does not have access to Plaintiff's medical records. Plaintiff's letter does include one page of a medical record from October 30, 2023 from Lincoln Hospital, but it does not mention a broken nose, only noting that he has chronic neuropathy and was discharged with a wheelchair.

The City thanks the Court for its consideration.

Respectfully submitted,

*Jesse N. Zilinski*

Jesse N. Zilinski
*Assistant Corporation Counsel*
Special Federal Litigation Division

cc:    **VIA REGULAR MAIL**
       Robert Lee Murray
       B&C: 9902300038
       George R. Vierno Center
       09-09 Hazen Street
       East Elmhurst, NY 11370

3

require

1)

at This Time I am Being
Refused my midication and
my Chair Back and They are
Not sending me To an out
side provider

I was Taken out of a medical
unit in(NIC) I was Taken out
for The resin of retalieation for
Fileing Lawsuit

on 6-24-24 officer Sent A inmates
after me again I am injurd my
Leg has swelling my Teeth was kockd
out and Im Being refuse my medication
for my neuropathy condition and HIV t
medication and They had The
inmates still all my Legal work
pretainning To my Lawsuits

## VII.   PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I understand that if I file three or more cases while I am a prisoner that are dismissed as frivolous, malicious, or for failure to state a claim, I may be denied *in forma pauperis* status in future cases.

I also understand that prisoners must exhaust administrative procedures before filing an action in federal court about prison conditions, 42 U.S.C. § 1997e(a), and that my case may be dismissed if I have not exhausted administrative remedies as required.

I agree to provide the Clerk's Office with any changes to my address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

7-11-24
Dated

Plaintiff's Signature

Robert                Lee
First Name              Middle Initial

Murray
Last Name

1600 Hazen St
Prison Address

E. Elmhurst                        NY                    11370
County, City                       State                 Zip Code

Date on which I am delivering this complaint to prison authorities for mailing: _____

Page 6